IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned On Briefs August 19, 2009

## IN RE: M.M.M. (d/o/b 10/13/2007), A Child Under Eighteen (18) Years of Age

Direct Appeal from the Juvenile Court for Madison County
No. 47-42, 508     Christy R. Little, Judge

_____

### No. W2009-00909-COA-R3-PT - Filed December 4, 2009

_____

The juvenile court terminated the parental rights of the appellant, L.M. ("Mother"), on April 7, 2009. The court found multiple grounds for termination and concluded that termination was in the best interests of the child. Mother appeals. We affirm in part and reverse in part.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in part; Reversed in part; and Remanded

DAVID R. FARMER, J., delivered the opinion of the court, in which HOLLY M. KIRBY, J. and J. STEVEN STAFFORD, J., joined.

Melissa A. Downing, Jackson, Tennessee, for the Appellant.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General and Lindsey O. Appiah, Assistant Attorney General, for the State of Tennessee, Department of Children's Services.

Angela L. Jenkins Hines, Guardian Ad Litem.

### OPINION

#### I. Background and Procedural History

Unfortunately, this is not the first appearance of Mother before this Court. We considered the termination of Mother's parental rights as to six children not the subject of this appeal in *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158 (Tenn. Ct. App. Aug. 20, 2007) (*no perm. app. filed*). This Court affirmed the decision of the juvenile court to terminate Mother's parental rights on the ground of persistence of conditions, noting that Mother's case was "not the 'typical' parental termination case that arises from intentional physical and/or mental abuse or willful abandonment." *In re M.A.B.*, 2007 WL 2353158, at *3.

Neither we nor the trial court suggested that Mother did not love her children or that she acted inappropriately around them. *Id.* Mother was simply unable and unwilling to provide her children with the bare necessities of food, clothing, and housing on a consistent basis. *Id.* She was equally unable and unwilling to protect her children from the threat of abuse. *Id.* After finding persistent conditions, we concluded that termination of Mother's parental rights was in the best interests of the children. *Id.* at *5.

Shortly after we announced our decision in *In re M.A.B.*, Mother gave birth to her ninth child, M.M.M. M.M.M. was placed in protective custody with the Tennessee Department of Children's Services ("DCS") because Mother tested positive for cocaine and marijuana just days before giving birth to the child. M.M.M. remained in DCS' custody after Mother stipulated that probable cause existed to believe M.M.M. was dependent and neglected. On February 19, 2008, the juvenile court entered a final order adjudicating M.M.M. dependent and neglected and reserving the determination of whether M.M.M. suffered severe child abuse as a result of Mother's prenatal drug use.

The juvenile court's order on dependency and neglect also ratified a permanency plan ("First Plan") that DCS prepared at a meeting with Mother on November 14, 2007. The First Plan aimed to reunite Mother with M.M.M. or to place the child with relatives. Mother's desired outcomes under the plan were to remain drug free and to obtain appropriate and stable housing. The First Plan required Mother to complete an alcohol and drug assessment, follow the recommendations of the assessment, test negative at random drug screens, seek affordable housing on a regular basis, and report her progress on obtaining housing. Her additional responsibilities included attending weekly supervised visitations or notifying DCS if she was unable to attend. Mother signed and dated the First Plan on November 14, 2007.

The juvenile court later approved a second permanency plan ("Second Plan") over the objection of Mother's attorney. The Second Plan substituted the goal of adoption for the goal of placement with relatives. The listed reason for the change was Mother's continued inability to provide a stable atmosphere in which to raise M.M.M. The Second Plan also added a third desired outcome of "achieving appropriate coping skills for the management of [Mother's] thoughts, feelings and behavior." In order to achieve this outcome, the Second Plan required Mother to submit to medical treatment and counseling on a consistent basis. Mother was not present when DCS prepared the Second Plan on June 19, 2008, and testified that she did not receive a copy of the Second Plan.

DCS, due to no fault of its own, was unable to provide Mother with services for the majority of these proceedings. Cynthia Perry ("Ms. Perry"), a DCS employee who actively participated in both of Mother's cases, testified that contacting Mother was extremely difficult. Mother did not have a telephone and did not give Ms. Perry any personal contact information. As a result, Ms. Perry was consistently unable to determine the whereabouts of Mother and was forced to rely on Vanetta Mosby ("Ms. Mosby") at the Carl Perkins Center, family members, and other loosely associated individuals to relay information. Ms. Perry mailed communications,

some of which Mother admitted receiving, to an address on Cloverdale in Jackson, Tennessee that was part of the prior termination hearing. Ms. Perry, however, was unable to locate Mother at that address. At one point, Ms. Perry received correspondence from a person claiming to be Mother's roommate on Stoddert Street in Jackson, but she was also unable to locate Mother there.

To further complicate the situation, Mother disappeared to Nashville during the summer of 2008. Mother testified that she gave her Nashville contact information only to Ms. Mosby and she instructed Ms. Mosby not to share that information. Ms. Mosby denied receiving contact information for Mother in Nashville. DCS did not have an address or telephone number for Mother in Nashville in either situation. Mother did not try to contact DCS by telephone, mail, electronic mail, or any other means of communication during this period. Ms. Perry testified that her last contact with Mother occurred around April 2008. Mother admitted that she quit contacting DCS in June 2008 despite understanding the duty to communicate with her family services worker. Because DCS did not know Mother's whereabouts, it was unable to provide her with the Second Plan and additional services. It appears that Mother returned to Jackson in November 2008 to give birth to her tenth child.

DCS petitioned to terminate Mother's parental rights on November 26, 2008. DCS alleged as grounds abandonment by failure to visit or support, abandonment by failure to establish a suitable home, substantial noncompliance with the provisions of the permanency plans, persistence of the conditions that required removal, and severe child abuse. DCS averred that Mother had not provided suitable housing, obtained recommended services, established a meaningful relationship with M.M.M., or become drug free. DCS further alleged it was in the best interests of M.M.M. to terminate Mother's parental rights.

Mother made several important admissions in her answer to DCS' petition. Mother admitted that she tested positive for cocaine and marijuana on October 13, 2007, shortly before the birth of M.M.M. She admitted that she and M.M.M. tested positive for cocaine on November 30, 2007. Mother further admitted that her actions amounted to severe child abuse as defined by Tennessee Code Annotated section 37-1-102(b)(23) (Supp. 2009).[1] Mother denied all other pertinent allegations concerning grounds.

The juvenile court conducted a final hearing in the matter on March 17, 2009. The juvenile court found clear and convincing evidence to support the grounds of abandonment by failure to visit, abandonment by failure to establish a suitable home, substantial noncompliance, persistence of conditions, and severe child abuse. The juvenile court concluded that termination was in the best interests of M.M.M. The court incorporated its findings into a written order dated April 7, 2009, and later filed an amended order on remand from this Court. Mother timely filed a notice of appeal.

_____

[1]The definition of severe child abuse was formerly found in subsection (b)(21). *See* Tenn. Code Ann. § 37-1-102(b)(21) (2005).

## II. Issues Presented

Mother presents the following issues for review as restated:

(1)     Whether the alleged failure to include Mother in the creation of her permanency plans and failure to provide Mother with a copy of her permanency plans required dismissal of DCS' petition.

(2)     Whether clear and convincing evidence supported the juvenile court's finding of grounds for termination.

(3)     Whether DCS clearly and convincingly proved that termination of Mother's parental rights was in the best interests of the child.

## III. Standard of Review

This Court reviews a trial court's findings of fact *de novo* upon the record, according a presumption of correctness to the findings unless a preponderance of the evidence is to the contrary. Tenn. R. App. P. 13(d). This Court will not reevaluate the determinations of a trial court based on an assessment of credibility unless clear and convincing evidence is to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005) (citation omitted). This Court reviews the record *de novo* where the trial court has not made a specific finding of fact. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). No presumption of correctness attaches to a trial court's conclusions of law. Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights. The Code provides, in pertinent part:

> (c) Termination of parental or guardianship rights must be based upon:
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c)(1)-(2) (2005 & Supp. 2009). This two-step analysis requires appellate courts to consider "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Although the 'clear and convincing evidence' standard is more exacting than the 'preponderance of the evidence' standard, it does not require the certainty demanded by the 'beyond a reasonable doubt' standard." *In re M.A.B.*, No. W2007-00453-COA-R3-PT, 2007 WL 2353158, at *2 (Tenn. Ct. App. Aug. 20, 2007) (citing *In*

*re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)). "Clear and convincing evidence is evidence that eliminates any substantial doubt and that produces in the fact-finder's mind a firm conviction as to the truth." *Id.* (citation omitted).

The clear and convincing standard is necessary because parents have a fundamental right to the care and custody of their children. *Santosky v. Kramer*, 455 U.S. 745, 768-69 (1982); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). "No civil action carries with it graver consequences than a petition to sever family ties indelibly and forever." *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *4 (Tenn. Ct. App. Mar. 9, 2004). The termination of parental rights eliminates "all of the rights, responsibilities, and obligations of the parent[]," Tenn. Code Ann. § 36-1-113(d)(3)(C)(i) (2005 & Supp. 2009), and removes a parent's "right to object to the child's adoption or thereafter, at any time, to have any relationship, legal or otherwise, with the child." Tenn. Code Ann. § 36-1-113(d)(3)(C)(iii) (2005 & Supp. 2009). The heightened burden of proof in parental termination cases guards against unwarranted severance of the constitutionally protected parent-child relationship. *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

Additionally, "[t]he heightened burden of proof in parental termination cases requires us to distinguish between the trial court's findings with respect to specific facts and the 'combined weight of these facts.'" *In re T.L.N.*, No. M2008-01151-COA-R3-PT, 2009 WL 152544, at *3 (Tenn. Ct. App. Jan. 21, 2009) (citing *In re M.J.B.*, 140 S.W.3d 643, 654 n.35 (Tenn. Ct. App. 2004)). "Although we presume the trial court's specific findings of fact to be correct if they are supported by a preponderance of the evidence, 'we are the ones who must then determine whether the combined weight of these facts provides clear and convincing evidence supporting the trial court's ultimate factual conclusion.'" *Id.* (quoting *In re M.J.B.*, 140 S.W.3d at 654 n.35).

## IV. Analysis

### A. Notice

Mother asserts that DCS failed to notify her of her parental rights and responsibilities, failed to include her in the development of her permanency plans, and failed to supply her with a copy of her permanency plans. She seeks dismissal of this action, citing the decision of this Court in *In re B.L.C.*, No. M2007-01011-COA-R3-PT, 2007 WL 4322068 (Tenn. Ct. App. Dec. 6, 2007) (reversing a finding of abandonment for failure to provide statutorily required notice) (*no perm. app. filed*). Although we disagree with Mother's factual assertion that DCS failed to include her in the development of her initial permanency plan, she has perhaps inadvertently touched upon a consideration worthy of review in the present appeal, namely whether DCS provided adequate notice on the ground of abandonment.

We begin by recognizing that the record shows Mother participated in the drafting of her initial permanency plan. Ms. Perry and DCS team leader Gloria Daniels ("Ms. Daniels") testified that Mother participated in the staffing of the First Plan on November 14, 2007, during

which the parties discussed the criteria for termination of Mother's parental rights. Mother claimed, to the contrary, that Ms. Daniels was not present and that Ms. Perry never discussed the criteria for termination with her at the November 14th meeting. Mother testified that she signed a blank permanency plan at Ms. Perry's request, which Ms. Perry later completed without her knowledge.[2] The juvenile court found Ms. Perry and Ms. Daniels credible and resolved the question of whether DCS discussed the criteria for termination of parental rights with Mother in DCS' favor. The juvenile court's decision to accept Ms. Perry's and Ms. Daniels' testimony as credible is an implicit rejection of Mother's testimony on the events in question. We therefore conclude, as Ms. Perry and Ms. Daniels testified, that Mother participated in the drafting of the First Plan, which contains her signature.

Our conclusion that Mother participated in the drafting of the First Plan does not entirely dispel her argument on appeal. The mere participation of Mother in the drafting of the First Plan does not in and of itself satisfy the heightened notice requirements at issue in *In re B.L.C.* This Court in *In re B.L.C.* explained that parents must receive special notice on the ground of abandonment:

> As a prerequisite to a proceeding to terminate on the ground of abandonment, the Tennessee legislature has established statutory requirements for the type of notice that must be given to a parent when the child has been placed in foster care. *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862 (Tenn. Ct. App. M.S., filed June 30, 2005). The required notice varies depending on the extent of the parent's participation in the formation of the permanency plan. The *In re J.L.E.* Court recently summarized these statutory notice provisions and the rationale for them, stating as follows:
>
>> Tennessee Code Annotated § 37-2-403 establishes requirements for a permanency plan for a child placed in foster care. It also establishes requirements for notice to parents of the definition and potential consequences of "abandonment" as that term is defined in Tenn. Code Ann. § 36-1-102. First, that definition and the potential and procedures for termination of parental rights are to be included on the initial permanency plan itself, which is to be signed by the parent. Tenn. Code Ann. § 37-2-403(a)(2)(A). Second, at the hearing on the court's consideration of the permanency plan, the court "shall explain on the record the law relating to abandonment contained in § 36-1-102." Tenn. Code Ann. § 37-2-403(a)(2)(B)(i). If the parents are not present at the first hearing, the court is to make the required explanation at any subsequent hearings. *Id.*

---

[2]At the termination hearing, Mother went so far as to state that Ms. Perry and Ms. Daniels lied under oath when they testified about their participation in the meeting of November 14, 2007.

*In re J.L.E.*, 2005 WL 1541862, at *7 (footnote omitted). If the parents do not appear at permanency plan hearings or cannot be provided notice of such hearings, DCS may still proceed to terminate parental rights on the ground of abandonment when the child or children have been placed in foster care "under § 36-1-102" only if DCS demonstrates specified things at the time of the termination proceeding. *Id.*; Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii). Those showings are:

> (a) That the court record shows, or the petitioning party presents to the court a copy of the permanency plan or plan of care that shows that the defendant parents or legal guardians, subsequent to the court review in subdivision (a)(2)(B)(i), has signed the portion of the permanency plan or plan of care which describes the criteria for establishing abandonment under § 36-1-102, or that the court record shows that, at a subsequent hearing regarding the child, the court made the statements to the parents or legal guardians required by subdivision (a)(2)(B)(i).

> (b) By an affidavit, that the child's permanency plan or plan of care containing language which describes the criteria for establishing abandonment under § 36-1-102 was presented by the agency party to the parents or guardians at any time prior to filing the termination petition, or that there was an attempt at any time to present the plan which describes the criteria for establishing abandonment under § 36-1-102 to the parents or guardians at any time by the agency party, and that such attempt was refused by the parents or guardians.

> (c) That, if the court record does not contain a signed copy of the permanency plan or plan of care, or if the petitioning agency cannot present evidence of a permanency plan or plan of care showing evidence of such notice having been given or an affidavit showing that the plan was given or that the plan was attempted to be given to the parents or guardians by the agency and was refused by the parents or guardians, and, in this circumstance, if there is no other court record of the explanation by the court of the consequences of abandonment and the right to seek an attorney at any time, then the petitioning agency shall file with the court an affidavit in the termination proceeding which describes in detail the party's diligent efforts to bring such notice required by subdivision (a)(2)(B)(i) to such parent or guardian at any time prior to filing the agency's filing of the termination petition.

Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii)(emphasis added); *In re J.L.E.*, 2005 WL
1541862, at *7-8; *see also State Dep't of Children's Services v. K.W.C.*, No.
E2007-00307-COA-R3-PT, 2007 WL 2198593, at *9-10 (Tenn. Ct. App. E.S.,
filed Aug. 1, 2007). "The notice provisions of the statute are designed to inform
parents, before they engage in conduct constituting abandonment, of the potential
consequences of that conduct. Otherwise, it has no real purpose." *In re J.L.E.*,
2005 WL 1541862, at *9.

*In re B.L.C.*, 2007 WL 4322068, at *4-5.

The record does not establish that DCS provided Mother with the requisite notice on the
law of abandonment. Mother signed the first of two permanency plans that the court ratified, but
neither plan included an explanation of the law of abandonment. Similarly, Mother attended the
first of two hearings at which the court ratified the permanency plans, but the record on appeal
does not show that the juvenile court explained on the record the law relating to the ground of
abandonment. The record is equally devoid of attempts to make a showing in accordance with
Tennessee Code Annotated section 37-2-403(a)(2)(B)(ii)(a)-(c). We therefore reverse the ruling
of the juvenile court to the extent it relied on the grounds of abandonment by willful failure to
visit and abandonment by failure to establish a suitable home. We find no reversible error as to
the remaining grounds of substantial noncompliance, persistence of conditions, and severe child
abuse. *See State, Dep't of Children's Servs. v. K.W.C.*, No. E2007-00307-COA-R3-PT, 2007
WL 2198593, at *10 (Tenn. Ct. App. Aug. 1, 2007) (holding that the notice requirements of
Tennessee Code Annotated section 37-2-403 apply only to the ground of abandonment) (*no
perm. app. filed*).

### B.  Grounds

This Court will not reverse a termination decision for failure to establish grounds so long
as a preponderance of the evidence clearly and convincingly demonstrates one of the statutorily
provided grounds. *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct.
App. 2008) (citation omitted). The remaining grounds before this Court are substantial
noncompliance with the permanency plans pursuant to Tennessee Code Annotated section 36-1-
113(g)(2), failure to remedy the conditions which led to the child's removal pursuant to
Tennessee Code Annotated section 36-1-113(g)(3), and severe child abuse pursuant to Tennessee
Code Annotated section 36-1-113(g)(4).

### i. Substantial Noncompliance With the Permanency Plans

Tennessee Code Annotated section 36-1-113(g)(2) establishes a ground for termination if
"[t]here has been substantial noncompliance by the parent or guardian with the statement of
responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37,
chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2) (2005 & Supp. 2009). Termination for
substantial noncompliance is warranted only when the plan's requirements are "'reasonable and

related to remedying the conditions which necessitate foster care placement.'" *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). The determination of whether noncompliance is substantial compares the degree of noncompliance with the importance of the unmet obligation. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citations omitted). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Id.* at 656-57 (citations omitted).

The juvenile court found substantial noncompliance based on Mother's failure to complete the following requirements of her permanency plans: (1) remain drug free, (2) complete an alcohol and drug assessment, (3) follow the recommendations of the alcohol and drug assessment, (4) pass random drug screens, (5) secure appropriate and affordable housing, (6) report her progress on securing appropriate and affordable housing, (7) resolve her delinquent utility bill, (8) submit to medication management on a consistent basis, and (9) attend counseling on a consistent basis. The court found that these requirements were reasonably related to remedying the conditions that necessitated foster care and concluded that DCS made reasonable efforts to assist Mother.

Mother does not argue that DCS failed to clearly and convincingly establish substantial noncompliance or that the requirements of her permanency plans were not reasonably related to remedying the conditions that led to removal. Her primary defense is that she did not participate in the drafting of her permanency plans, did not receive a copy of either plan, and had no knowledge as to their contents.[3] As we explained earlier, Mother signed the First Plan after she participated in its creation. It follows that Mother was aware of her obligations under the plan. Although Mother did not participate in the staffing of the Second Plan, DCS mailed a copy to Mother's last known address. It is not clear whether Mother received a copy of the Second Plan. Because the juvenile court did not find that DCS was able to inform Mother of the additional parental responsibilities set forth in the Second Plan, we will limit our consideration on this issue to Mother's noncompliance with the terms of the First Plan. *See* Tenn. Code Ann. § 37-2-403(a)(2)(C) (2005 & Supp. 2009) (providing that a court may terminate for substantial noncompliance when a parent fails to sign or consent to the terms of a permanency plan if the court finds that the parent was informed of his or her responsibilities under the plan).

We hold that DCS clearly and convincingly established Mother's substantial noncompliance with the First Plan. Mother did not complete an alcohol and drug assessment or follow the recommendations of that assessment. Ms. Perry testified that Mother refused an alcohol and drug assessment scheduled with Pathways in Jackson. Ms. Perry's contact notes showed that DCS called to notify Mother that an assessment had been approved in February 2008 and that Mother refused to complete the assessment in March 2008. This evidence refuted

---

[3]Mother also asserts on appeal that DCS provided no assistance with her outstanding utility bill. We interpret this argument as questioning whether DCS made reasonable efforts to reunify Mother and child. We conclude that DCS made reasonable efforts under the circumstances. *See In re M.A.B.*, 2007 WL 2353158, at *5 (addressing a similar argument in Mother's prior termination case).

Mother's claim that Pathways denied her attempts to obtain an assessment because it had not received authorization from DCS. The record further shows that Mother did not report her progress on securing appropriate and affordable housing, did not resolve her delinquent utility bill, did not regularly attend visitation, and did not pass at least two random drug screens administered after the preparation of the First Plan.[4] These facts clearly and convincingly established Mother's substantial noncompliance with the requirements of the First Plan. We therefore affirm the decision of the juvenile court on the ground of substantial noncompliance.

### ii. Persistence of Conditions

Mother next argues that DCS did not clearly and convincingly prove the ground of persistence of conditions. The ground of persistence of conditions is defined at Tennessee Code Annotated section 36-1-113(g)(3) as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A)-(C) (2005 & Supp. 2009). A finding on the ground of persistence of conditions is not appropriate unless DCS presents clear and convincing evidence to establish each statutory element. *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006) (citing *In re Valentine*, 79 S.W.3d at 550).

The juvenile court found the following persistent conditions in this case: "the lack of appropriate, affordable and stable housing, the lack of stability in the life of the mother, the failure of the mother to remain drug free, and the inconsistency of visitation and participation in the child's life." The court concluded that these conditions remained despite DCS' reasonable efforts to arrange an alcohol and drug assessment, to provide random drug screens, to offer counseling and medication management services, to supervise visitation, to help Mother secure

---

[4]The most recent positive drug screen was administered on January 15, 2008.

housing, and to assist Mother in resolving her delinquent utility bill.[5] The court further concluded that Mother was not likely to remedy these conditions at an early date and that the continuation of the parent-child relationship would greatly diminish the possibility of integrating the child into a stable and permanent home.

We are unable to concur in the juvenile court's decision to the extent it relied on continued drug use as a persistent condition in this case. Mother correctly points out that DCS offered no evidence to establish drug use after January 2008. At the termination hearing, Mother acknowledged that she smoked marijuana that may have contained cocaine while pregnant, but testified she had not taken drugs since the initial incident in 2007. DCS conceded that Mother never refused a drug test and the court recognized that drug use was not an issue in the prior case. DCS offered no evidence to show that Mother continued to use drugs in the twelve months prior to the termination hearing. We agree with Mother's assertion that a positive drug screen almost one year before the filing of a termination petition does not clearly and convincingly prove persistent drug use when DCS did not offer and Mother did not refuse any subsequent tests. *See In re Z.V.S.P.*, No. M2009-00058-COA-R3-PT, 2009 WL 1910919, at *15 (Tenn. Ct. App. July 1, 2009) (modifying a finding of persistence of conditions to the extent it relied on unproven drug use) (*no perm. app. filed*).

We nevertheless conclude that DCS clearly and convincingly established the ground of persistence of conditions. Mother's actions throughout this case demonstrated the same type of instability that led to a finding of persistent conditions in *In re M.A.B.* She did not make progress on eliminating her overdue utility bill and continued to refuse to seek housing with the Jackson Housing Authority.[6] She did not consistently report her efforts to obtain housing and disappeared to Nashville for several months during the summer of 2008. There is no indication that she expended reasonable efforts to find stable, suitable housing prior to the filing of DCS' termination petition. The totality of the facts in the record shows that Mother, in the words of the juvenile court, continued to live a "nomadic lifestyle" throughout these proceedings. This nomadic lifestyle contributed to Mother's failure to consistently visit the child and her failure to participate in the child's life, which we agree would in all reasonable probability cause the child to be subjected to further abuse or neglect under the circumstances.

The fact that Mother resided with her recently born tenth child in a home with utilities after DCS filed its termination petition does not compel a different conclusion. *See In re Baker*, No. W1998-00606-COA-R3-CV, 1999 WL 1336044, at *4 (Tenn. Ct. App. Dec. 28, 1999) (concluding that a decision to allow children born after an initial removal to remain with a parent was not persuasive on whether termination was appropriate as to those children already

---

[5]The court's finding stated in relation to Mother's substantial noncompliance that DCS made additional reasonable efforts to make referrals to the appropriate service providers, provide case management services, conduct child and family team meetings, and arrange supervised visitation.

[6]These conditions factored into our previous decision to affirm the termination of Mother's parental rights. *See In re M.A.B.*, 2007 WL 2353158, at *4.

removed).  At the time of the termination hearing, Mother was not on the lease at her most recent residence and had not eliminated the barriers to finding a suitable home should she be asked to leave.  Her last-minute efforts to find housing did not demonstrate to the juvenile court that she had resolved her instability and related issues.  Having reviewed the record, we agree with the juvenile court and affirm the court's finding of persistent conditions.

### iii.  Severe Child Abuse

Tennessee Code Annotated section 36-1-113(g)(4) provides a ground for termination when the juvenile court finds that a parent has committed severe child abuse.  Tenn. Code Ann. § 36-1-113(g)(4) (2005 & Supp. 2009).  The General Assembly has defined severe child abuse as follows:

> (A)  The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm or death and the knowing use of force on a child that is likely to cause great bodily harm or death;
>
> (B)  Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;
>
> (C)  The commission of any act towards the child prohibited by §§ 39-13-502--39-13-504, 39-13-522, 39-15-302, and 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child; or
>
> (D)  Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring[.]

Tenn. Code Ann. § 37-1-102(b)(23)(A)-(D) (2005 & Supp. 2009).

The juvenile court found clear and convincing evidence to show that Mother committed severe child abuse against M.M.M.  Mother does not directly attack the finding of severe child abuse on appeal, but instead argues within her best-interests analysis that Tennessee courts have not definitively decided the question of whether prenatal conduct can amount to severe child abuse.  To the degree we perceive Mother's argument as challenging the finding of severe child abuse, we hold that she may not pursue the argument on appeal.  Mother conceded in her answer to DCS' termination petition that she committed severe child abuse against M.M.M.  At the termination hearing, Mother did not raise the question of whether her prenatal drug use amounted

-12-

to severe child abuse.[7]  As a result, the question of whether Mother's prenatal drug use amounted to severe child abuse is not properly before this Court.  *See Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006) (citation omitted) ("Issues not raised in the trial court cannot be raised for the first time on appeal.").  We note, however, that the juvenile court's finding is consistent with the resolution of the issue in prior opinions of this Court.  *See, e.g., In re Benjamin M.*, No. E2009-00209-COA-R3-JV, 2009 WL 3518165 (Tenn. Ct. App. Oct. 30, 2009); *Cornelius v. State, Dep't of Children's Servs.*, No. W2008-02217-COA-R3-JV, 2009 WL 1929157 (Tenn. Ct. App. July 6, 2009), *reh'g denied*, No. W2008-02217-COA-R3-JV, 2009 WL 1929157 (Tenn. Ct. App. Aug. 6, 2009), *app. for perm. to appeal filed*.  We affirm the juvenile court's finding on the ground of severe child abuse.

### *C. Best Interests*

We proceed to consider whether termination of Mother's parental rights is in the best interests of M.M.M.  Termination of a parent's rights and responsibilities is appropriate only when clear and convincing evidence establishes that termination is in the best interests of a child. Tenn. Code Ann. § 36-1-113(c)(2) (2005 & Supp. 2009).  The General Assembly has established a non-exhaustive list of factors to consider when determining the best interests of a child:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether

---

[7]The facts alleged to constitute severe child abuse were not in question at the termination hearing.  It is well settled that "[w]hen the allegations of the complaint are admitted in the answer the subject matter thereof is removed as an issue, no proof is necessary and it becomes conclusive on the parties."  *Rast v. Terry*, 532 S.W.2d 552, 554 (Tenn. 1976) (citation omitted).

there is such use of alcohol or controlled substances as may render the parent or
guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status
would be detrimental to the child or prevent the parent or guardian from
effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with
the child support guidelines promulgated by the department pursuant to §
36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(9) (2005 & Supp. 2009). "Every factor need not be
applicable in order for the trial court to determine that it is in the best interest of the child for a
parent's right[s] to be terminated." *In re D.C.A.*, No. M2008-01279-COA-R3-PT, 2009 WL
837877, at *8 (Tenn. Ct. App. Mar. 30, 2009) (*no perm. app. filed*). The weight and relevance of
these factors may vary from case to case and it is possible that a single factor is determinative.
*Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)).

The juvenile court found that termination was in the best interests of M.M.M. The court
noted Mother's failure to make an adjustment of circumstances that would make it safe for the
child's return and Mother's failure to complete the services outlined in her permanency plans.
The court found that Mother had not maintained regular visitation prior to termination and that
Mother's continued use of alcohol or controlled substances rendered her unable to care for
M.M.M. in a safe and stable manner. The court also found that Mother had not established a
meaningful relationship with the child. The court concluded that a change of custody and
physical environment under the facts was "likely to have a negative effect on the child's
emotional, psychological and/or medical condition." Although we are unable to hold that the
record supports each of the factors relied upon, we agree with the court's conclusion that clear
and convincing evidence supported termination.

The record supports the juvenile court's finding that Mother did not regularly visit or
have contact with M.M.M. and consequentially did not establish a meaningful relationship with
the child. The record shows that Mother failed to appear for twenty-two of her thirty-seven
supervised visits with M.M.M. and that Mother engaged in no more than token visitation in the
five months preceding the filing of the termination petition. At the time of the hearing, Mother
had not visited with M.M.M. for nearly nine months. M.M.M.'s foster father testified that
Mother did not call, provide financial support, give gifts, or otherwise provide support for the
child throughout the proceedings.[8] Mother admitted that she did not establish a meaningful
relationship with her daughter and Ms. Perry agreed with that assessment. Ms. Perry further

---

[8]M.M.M.'s foster father later admitted that it would have been inappropriate for Mother to contact the foster
parents outside of their supervised interaction at the Carl Perkins Center and that it was possible that Mother has brought
gifts to the child during visits at the center. Ms. Mosby testified that Mother did bring some small gifts to M.M.M.
before she stopped visiting.

testified that she witnessed no positive steps in Mother's behavior subsequent to the first termination case.

The record shows that the foster parents, on the other hand, established a meaningful relationship with M.M.M., who they have continuously cared for since birth. The foster parents reported at the termination hearing that M.M.M. was a healthy, happy, and playful child. Importantly, M.M.M. was not experiencing tremors and was reaching important developmental milestones. The foster father testified that M.M.M. called the foster parents "Mama" and "Daddy" and was learning the names of her two brothers who the foster parents adopted after Mother's rights were terminated in *In re M.A.B*. Although the foster parents were advanced in age, they believed they were capable of raising M.M.M. for another seventeen years and explained that they have two grown daughters willing to support the children should difficulties arise. The foster parents hoped to adopt M.M.M. at the conclusion of the termination proceedings.

The record as a whole also supports the juvenile court's findings on several other best-interests factors. It shows that Mother did not make a change of circumstance, conduct, or conditions as to make it safe and in the child's best interest to return to her; that she failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible; and that she severely abused the child. DCS further established that a change of caretakers and physical environment was likely to have a detrimental effect on the child's emotional, psychological, and medical condition. We conclude that the facts, as established by a preponderance of the evidence, clearly and convincingly showed that termination was in the best interests of M.M.M.

## V. Conclusion

For the foregoing reasons, we affirm the decision of the juvenile court on the grounds of substantial noncompliance, persistence of conditions, and severe child abuse, but reverse on the grounds of abandonment by willful failure to visit and abandonment by failure to establish a suitable home. Because DCS demonstrated that termination of Mother's parental rights was in the best interests of M.M.M., we hold that the juvenile court did not err in terminating the parental rights of Mother. Costs of this appeal are assessed to the appellant, L.M.

_____
DAVID R. FARMER, JUDGE